· PHILLIP ASHBY *v.* STATE.·

·(*Jackson*. April Term, 1911.)

1. **STATUTES.** Words may be modified, altered, or supplied to reach legislative intent.

It is a well settled rule of statutory construction that in order to effectuate the legislative intent, words may be modified, altered, or supplied, so as to obviate any repugnancy or inconsistency with such intention. (*Post, p.* 691.)

Cases cited and approved: State, ex rel., v. Turnpike Co., 2. Sneed, 88; Nichols & Shepherd Co. v. Loyd, 111 Tenn., 145; Wright v. Cunningham, 115 Tenn., 452.

2. **SAME.** Words supplied as evidently omitted so as to give a sensible meaning; case in judgment.

A statute (Acts 1909, ch. 403) entitled "An act to create a board of jury commissioners for counties * * * having a popu- lation of 19,100 and less than 19,000 inhabitants by the federal census of 1900," etc., is meaningless and unenforceable as simply insensate, unless it can be construed so as to give it a sensible meaning by the supplying of words evidently omitted; and it is *held*, under the rule stated in the preceding headnote, that the words "not more than" should be inserted immediately before the figures "19,100," and the word "not" should be inserted immediately before the word "less," so as to make that part of the caption and body of the act relating to the population limits to read "having a population of not more than 19,100, and not less than 19,000 inhabitants, so that the statute will not apply to a county of less than 19,000 inhabitants. (*Post, pp.* 689-693.)

Acts cited and construed: Acts 1909, ch. 403.

See citations of cases under preceding headnote.

Ashby v. State.

3. **PLEAS IN ABATEMENT.   Must be strictly construed, and exclude all intendments against them.**

Pleas in abatement are not favored in law, and must be construed with much strictness, and must possess the highest degree of certainty known to law in every particular; and they must exclude, by proper allegations and averments, every legal intendment or conclusion that might otherwise be made against them by the court. (*Post, pp.* 693, 697.)

Case cited and approved:   Pennel v. State, 122 Tenn., 631.

4. **SAME.   Same.   To indictment upon the ground that the grand jury was illegally constituted that is insufficient.**

Where a statute (Acts 1909, ch. 403) provides for the appointment of a board of three jury commissioners by the circuit judge of each county in which the statute is applicable, and that board shall every two years, or oftener if necessary, place in a jury box a list of names for jury service, and draw therefrom, before each term of court, a sufficient number of names for service at that term; and further provides (in section 12 thereof) that if a regular panel is not furnished for a circuit or criminal court at any term, as provided in the act, the presiding judge may select a panel, and such additional jurors as may be needed by his court during such term; and where a plea in abatement to an indictment averred that the accused "pleads in abatement to said indictment the provisions of the said act of * * * 1909, and that said indictment was not found and was not returned by a grand jury legally impaneled * * * from a list by the board of jury commissioners, as provided by said act of 1909," and further averred that it was "impaneled from a *venire* appointed by the county court of Benton county, Tenn., at its July term, 1910"; and it was *held* that the plea was insufficient, because it did not allege that the grand jury was not selected by the judge pursuant to the provisions of said section 12; for the judge may have selected such jurors from the list furnished by the county court. (*Post, pp.* 689-697.)

Ashby v. State.

NOTE. The decision made, as shown in this headnote, was based upon the hypothesis that said Acts 1909, ch. 403, was applicable in Benton county; but the court expressly held that said statute was not applicable in said county.—REPORTER.

Acts cited and construed: Acts 1909, .ch. 403, and specially sections 7 and· 12.

Case cited and approved: Pennel v. State, 122 Tenn., 631.

5. CRIMINAL LAW. Corpus delicti is not provable by confessions alone, but is so provable in connection with other evi-· dence.

While the·*corpus delicti* cannot be established by confessions alone, yet the confessions may be taken in connection with other evidence, direct or circumstantial, corroborating them, to establish it. (*Post, pp.* 697, 698.)

Cases cited and approved: Younkins v. State, 2 Cold., 221; Williams v. State, 12 Lea, 211, 212; Bines v. State, 68 L. R. A., 33, 73, 74, 75.

6. SAME. Same. Preliminary proof of corpus delicti before admission of confessions.

Some evidence of the *corpus delicti* should be introduced so as to show *prima facie* that fact, before admitting the confessions. (*Post, pp.* 698, 699.)

7. SAME. Same. Same. Admission of confessions before evidence of corpus delicti is not reversible error, when.

The error in admitting confessions before the introduction of evidence establishing *prima facie* the *corpus delicti* is not reversible error, where the *corpus delicti* is afterwards established. (*Post, p.* 699.)

Case cited and approved: Bines v. State, 68 L. R. A., 79, and note.

Ashby v. State.

8. **SAME. Same. Same. Same. Corpus delicti may be proved by circumstantial evidence.**

All the elements constituting the *corpus delicti* may be proved by circumstantial evidence. (*Post, p.* 699.)

Cases cited and approved: Lancaster v. State, 91 Tenn., 267; State v. Gillis, 73 S. C., 318.

9. **SAME. Same. Same. Same. Same. Circumstantial evidence is stated and held sufficient to prove corpus delicti.**

Circumstantial evidence in a first degree murder case is stated and *held* to be sufficient to establish the *corpus delicti* so as to authorize the admission of confessions. (*Post, pp.* 699-707.)

10 **MURDER IN THE FIRST DEGREE. Evidence of confessions is stated and held sufficient to prove the crime.**

In a prosecution for the murder of his wife by the accused, the evidence of confessions is stated and *held* to be sufficient to prove the guilt of the accused. (*Post, pp.* 707-714.)

11. **CRIMINAL LAW. Evidence is stated and held insufficient to prove insanity.**

The evidence in a prosecution for the murder of his wife by the accused is stated and *held* to be insufficient to show his insanity when the crime was committed. (*Post, pp.* 714-720.)

12. **SAME. Absence of motive does not prevent conviction.**

The absence of any apparent motive is not of itself sufficient for the predication of a conclusion of innocence, nor to prevent a conviction. (*Post, pp.* 720, 721.)

13. **EXPERT TESTIMONY. Failure of witness to qualify as expert physician on insanity.**

A physician is not qualified to testify as an expert on insanity, where he testified that he was a graduate of a medical school and had been a practicing physician for twenty-four years, but that his experience in treating mental diseases was very limited,

as he had had only two or three such cases, and these patients were maniacs, and that he had read several books on mental · diseases, but could not "remember" the names of the authors. (*Post, pp.* 722, 723.)

14. **SAME. Same. A physician is not qualified to testify as an expert on insanity, when.**

Where a physician testified that he had practiced medicine about forty-three years, but was not a graduate of any medical school, and had very little experience in treating insanity, though · he had read several medical works on mental diseases, and testified that he was not as well posted on mental diseases as on general diseases, it was *held* that he was not qualified to testify as an expert on insanity. (*Post, pp.* 723, 724.)

15. **CRIMINAL LAW. Testimony of statements of deceased as to smothering spells is properly excluded as hearsay.**

Testimony in a prosecution for murder, given in answer to a question as to whether the deceased ever had any smothering spells, that the deceased told the witness on Thursday before her death that she had one at home on the Tuesday night before while the witness was at church, was properly excluded as a matter of hearsay. (*Post, pp.* 724, 725.)

FROM BENTON.

Appeal in error from the Circuit Court of Benton County.—Jos. E. Jones, Judge.

George T. McCall and Joseph F. Odle, for Ashby.

Assistant Attorney-General Faw, for State.

MR. JUSTICE NEIL delivered the opinion of the Court.

Plaintiff in error was indicted in the circuit court of Benton county charged with the murder of his wife, Pearlie Ashby, on the 14th of August, 1910. He was convicted of murder in the first degree, and sentenced to be hanged. From this judgment, after his motion for a new trial was overruled, he appealed to this court, and has here assigned errors.

He filed a plea in abatement in the trial court, in which he averred:

"That said indictment was not found or returned into this court by a legally constituted grand jury of Benton county, Tenn. He avers that the grand jury finding and returning said indictment was impaneled as such from a *venire* appointed by the county court of Benton county, Tenn., at its July term, 1910, of said county court, and that said county court was without authority at that time to appoint said *venire,* and that this court was without authority to select and impanel said grand jury which returned said indictment into this court. Defendant avers that Benton county has a population of less than 19,000 and that said county therefore falls within the provisions of the Acts of the Legislature of 1909, House Bill No. 591, chapter 403, of the published acts, and which said bill was passed April 28, 1909, and approved April 30, 1909, and provides for a board of jury commissioners for each county in the State having a population of 19,100 and less 19,000 inhabitants by the federal census of 1900 or any subsequent federal census, which said act went into effect from and after its passage. . . . He therefore

124 Tenn.—44

pleads in abatement to said indictment the provisions of the said act of the legislature of Tennessee of the year 1909, and that said indictment was not found and was not returned by a grand jury legally impaneled and charged to inquire in and for the county of Benton from a list by the board of jury commissioners, as provided by said Act of 1909, and he therefore prays that said indictment be abated and that he may have the judgment of the court as to whether or not he shall be compelled to make any other or further answer to said indictment."

The district attorney general moved to strike the plea, among other things, because the provisions of the act of the legislature referred to did not apply to Benton county, and also because the act was unconstitutional and void; also because of the general insufficiency of the plea.

The trial judge sustained the motion to strike, and this action was assigned as error.

The caption of the act referred to reads as follows:

"An act to create a board of jury commissioners for counties in this State having a population of 19,100 and less than 19,000 inhabitants by the federal census of 1900 or that may have that number of inhabitants by any subsequent federal census, and for the election of juries; to prescsribe the duties of the members of said board and of the judges, and punish violation of this act; to provide for jury lists and jury boxes to be kept in each county affected by this act; and to repeal all laws in conflict with this act."

The language "a population of 19,100 and less than 19,000 inhabitants" is meaningless, and, unless it can be

construed so as to give it a sensible meaning by the sup-
plying of words evidently omitted, it would be unen-
forceable as simply an insensate act.   However, it is a
well-settled rule of statutory construction that in order
to effectuate the legislative intent "words may be modi-
fied, altered, or supplied so as to obviate any repugnancy
or inconsistency with such intention."   Lewis, Suth.
Stat. Construction (2 Ed.), Vol. 2, section 347.

Upon this subject we quote the brief of the learned
assistant attorney-general, Hon. W. W. Faw, what is re-
garded as a true view, believing that it could not be better
said than is there said:

"In the case of *State, ex. rel.* v. *Turnpike Co.*, 2 Sneed,
88, it appeared that the act of assembly under which the
turnpike company was incorporated authorized the com-
pany to erect a tollgate 'within two miles of the town
of Clarksville.'   This language, if literally interpreted,
clearly authorized the location of a gate at any point
nearer than two miles of the town of Clarksville.   This
court held that the words 'but no nearer' should be sup-
plied, and the act made to read, viz., 'may erect a toll-
gate within two miles of Clarksville, but no nearer.'

"Another instance wherein this court held that it was
proper to read words and clauses into a statute in order
to effectuate the obvious intent of the legislature is found
in the case of *Wright* v. *Cunningham*, 115 Tenn., 452,
91 S. W., 293.   It is there said, viz.:

" 'It is insisted that the amendment is fatally obscure
because it contains the following sentence:   "The ticket

shall provide for those favoring the small stock law, 'for the small stock law' and those 'against said law.' "

" 'Evidently there was an omission between the words "and" and "those" of the word "for," and after the word "those" an omission of the expression "opposing the small stock law."

" 'As thus corrected, the sentence would read: "The ticket shall provide for those favoring the small stock law, 'for the small stock law,' and for those opposing the small stock law, 'against the small stock law.' The word 'said' in the expression 'against said law,' of course, refers to the small stock law, and the intention of the act was that the ticket of those opposing the law should read 'against the small stock law.' It is a well-known canon of construction that an ambiguous or meaningless clause in a statute may be rejected, or words supplied by intendment to express the obvious intention of the legislature." '

"See, also, *Nichols. & Shepherd Co.* v. *Loyd,* 111 Tenn., 145, 76 S. W. 911.

"Referring to the act involved in the case at bar: By supplying the words 'not more than' immediately before the figures '19,100,' and the word 'not' immediately before the word 'less,' that part of the caption and of the body of the act relating to the population limits will read as follows: 'Having a population of not more than 19,100, and not less than 19,000 inhabitants, by the federal census of 1900, or that may have that number of inhabitants by any subsequent federal census.' Such was, beyond doubt, the legislative intent."

The act thus construed does not apply to Benton county; it having a population of less than 19,000.

We are also of the opinion that the following, contained in the said brief, states the law correctly:

"If the court should hold said chapter 403, Acts 1909, to be constitutional, and it includes Benton county, nevertheless, the plea was properly stricken out, because it is lacking in essential averment.

" 'Pleas in abatement are not favored in law. They are construed with much strictness, and must possess the highest degree of certainty known to the law in every particular.

" 'They must exclude, by proper allegations and averment, every legal intendment or conclusion that might otherwise be made against them by the court.' *Pennel* v. *State,* 122 Tenn., 631, 125 S. W., 445.

"The plea in the present case contains no statement which, in terms or in effect, avers that the grand jury was not selected by the circuit judge pursuant to section 12 of chapter 403, Acts 1909.

"For the present purpose, it is unnecessary to state in detail the provisions of said jury law, further than to say that a board of three jury commissioners is to be appointed by the circuit judge in each county, and said board shall, every two years, or oftener if need be, place in a 'jury box' a list of names of persons for jury service for the ensuing two years, and not less than ten nor more than fifteen days before each term of court the said board shall draw from the jury box a sufficient number

of names of persons for jury service at said term, which persons shall be summoned by the sheriff, and the chairman of said board shall deliver said list to the court on the first day of the term, and the juries, both grand and petit, shall be selected from said list.

"But, contemplating that by reason of many possible contingencies the list thus furnished by the board may turn out to be insufficient, the act (section 7) provides:

" 'That whenever the judge is satisfied that in any case a jury cannot be obtained from the regular panel or is satisfied that the business of the court will probably demand more jurors than are in attendance in court, he may, but not earlier than three days in advance, cause the jury box to be brought into open court and such number of names as he deems sufficient to obtain such jury to be drawn therefrom, and the sheriff shall forthwith summons the persons whose names are so drawn. From the panels so drawn and summoned and the regular panel the panels shall be made up if practicable. If not, another panel shall likewise be drawn and summoned instanter, and so on until the jury is completed or the jury box exhausted. If the jury box is exhausted before the jury is completed, the sheriff shall summons such other men as may be designated by the presiding judge until the jury is complete; provided, that in cases of emergency the presiding judge may, in his discretion, where the regular panel has been exhausted before the jury is completed, furnish the sheriff with additional names, who shall forthwith be summoned by the sheriff, and so on until the jury is completed.'

Ashby v. State.

"Further, contemplating that the jury commissioners, either willfully or through misadventure, may fail to fill or renew the jury box and furnish a *venire*, it is provided by section 12:

" 'That if for any reason the court should at any time discover that the jury box has not been filed (filled) or renewed, or that the jury list had not been prepared or renewed as required by law, or the panel drawn, or additional names drawn therefrom as required by law, or the jury box has been tampered with, the circuit or criminal judge may have the right to investigate said jury box and also the jury lists, and see that this act is duly enforced; and should it be discovered that any irregularity or fraud exists, correct same.

" 'If for any reason a legal panel is not furnished a circuit or criminal court at any regular or special term as provided by this act, then the judge of said court shall have the right to select a panel and such additional jurors as may be needed by this (his) court during said term of court.'

"In the absence of a negation in the plea, it will be presumed that jury commissioners had been appointed and had duly organized and provided jury boxes and furnished a *venire* or panel for the term. But, if the plea avers that the grand jury was not selected from a list thus provided, it will be presumed, in the absence of an averment to the contrary, that a panel was selected by the presiding judge by virtue of the power vested in him by section 12.

"The sole averment of the plea bearing on this matter is contained in the concluding paragraph, which is as follows, viz. :

" 'He therefore pleads in abatement to said indictment the provisions of the said act of the legislature of Tennessee of the year 1909, and that said indictment was not found and was not returned by a grand jury legally impaneled and charged to inquire in and for the county of Benton from a list by the board of jury commissioners as provided by said act of 1909, and he therefore prays that said indictment be abated and that he may have the judgment of the court as to whether or not he shall be compelled to make any other or further answer to said indictment.'

"It is manifest that the sole averment of a noncompliance with the provisions of chapter 403, Acts 1909, is that the grand jury was not selected from a list furnished by the board of jury commissioners of Benton county. Admitting the truth of this averment, it does not follow that the grand jury was not lawfully selected under and pursuant to the provisions of said act of 1909; for, if there was no list furnished by the jury commissioners, it was the duty of the judge to select a panel of qualified men from bystanders, or the body of the county, and the presumption is that he did his duty.

"It may be argued for plaintiff in error that the plea contains at least an inferential negation of the fact that the grand jury was selected pursuant to the provisions of the act of 1909, in that it is averred that the

grand jury 'was impaneled as such from a *venire* appointed by the county court of Benton county, Tenn., at its July term, 1910, of said county court.'

"This is not sufficient. As already stated, this court has repeatedly held that pleas in abatement 'must exclude, by proper allegations and averment, every legal intendment or conclusion that might otherwise be made against them by the court.' · If the presiding judge, in the exercise of the power conferred upon him by section 12 of chapter 403, Acts 1909, selected a grand jury of qualified persons from the body of the county, such appointment and selection would be none the less legal and proper if the county court had theretofore assumed to appoint a *venire,* and the judge selected men from the number who had been thus named by the county court."

We now come to the merits of the controversy.

The conviction was based principally upon the plaintiff in error's confessions. It was objected in the court below, and it is insisted here, that there was no evidence of the *corpus delicti* aside from the confessions, and therefore these latter were incompetent. The trial judge overruled the exception.

The rule upon this subject, as announced by the later authorities, and the great weight of authority, is that, while the *corpus delicti* cannot be established by confessions alone, yet the confessions may be taken in connection with other evidence. direct or circumstantial, corroborating them, and, if from all of the evidence so considered together the *corpus delicti* and the guilt of

the person with reference thereto is established beyond
a reasonable doubt, it is the duty of the jury to convict.
Such in effect is the statement contained, in brief, in 1
Elliott on Ev., section 292, and 4 Elliott on Ev., section
3034. This subject is discussed at some length and the
cases cited in a learned note to *Bines* v. *State*, 68 L. R.
A., 33, and subdivision "e" on pages 73, 74, and 75. This
rule seems to have been approved, meagerly it is true,
but substantially, in the following excerpt taken from
the opinion of the court in the case of *Williams* v. *State*,
12 Lea, 211, 212, viz: "A confession, when the *corpus
delicti* is not otherwise proven, will not sustain a con-
viction. But, when the *corpus delicti* is proven by other
evidence, a free and voluntary confession, deliberately
made, is, at common law, sufficient to sustain a convic-
tion, although some of the States have adopted a differ-
ent rule, especially in capital cases. * * *. But in this
case we hold there are corroborating circumstances, and
upon them, and the repeated confessions of the prisoner,
the conviction is sufficiently sustained." The same
thought seems to have underlain the language occurring
in *Younkins* v. *State*, 2 Cold., at page 221, wherein the
court considered the question whether the confessions
proven in that case in fact aided defective proof of the
*corpus delicti*, seeming to concede that they might be so
used in law, but holding that in the case under con-
sideration they did not in fact effect such aid.

Undoubtedly some evidence of the *corpus delicti*
should precede the introduction of the confessions of the

prisoner, to the extent at least of showing, *prima facie* (1 Elliott on Ev., sec. 292), that a crime has been committed, that is, in homicide cases, the death of a human being, and criminal agency in producing that death. But, if the wrong order be followed in the trial court, it is not reversible error. See cases cited in division V., p. 79, of 68 L. R. A., note to *Bines* v. *State.*

All of the elements constituting the *corpus delicti* may be proven by circumstantial evidence. *State* v. *Gillis,* 73 S. C., 318, 53 S. E., 487, 5 L. R. A., (N. S.) 571, 114 Am. St. Rep., 95. It appears that the whole case was proven by circumstantial evidence, in *Lancaster* v. *State,* 91 Tenn., 267, 18 S. W., 777. See, also, Underhill, Cr. Ev. (Ed. 1910), section 7.

The facts in the present case, disclosed by the record, apart from the confessions, are, in substance, as follows:

On the 13th of August, 1910, and for some two years prior thereto—and perhaps longer—plaintiff in error resided with his family, consisting of a wife and six children, in a house belonging to one Mellon Fry in Benton county, this State. The house was built of logs, and stood east and west. The west room was used by the family as the cook room. The east room was used for sleeping purposes. There was a hall between, and a porch out in front, and a shed room back of the east room. There was a half story above the first floor to which a stairway led. The deceased, Mrs. Pearlie Ashby, was accustomed to occupy a bed in the northeastern corner of the east room; the plaintiff in error a bed in the

southeast corner. A fireplace was in the east end of the
room. There was another bed in the southwest corner of
the room. On the night of the occurrence which is the
subject of the present controversy, the two older girls,
Raphie and Rita, were occupied for a time in the kitchen
washing dishes. At this time the plaintiff in error and
his wife were on a pallet in the east room. Plaintiff in
error was lying down and his wife was sitting up by him.
Soon the children came in with a lamp and proceeded to
study their lessons; both of them going to school. The
plaintiff in error and his wife were called upon to assist
them in their lessons, and did so for a time. Afterwards
the husband and wife went out to the barn to turn the
cows into the pasture, and came back. It was then about
9 o'clock. Plaintiff in error retired to his bed in the
southeast corner of the room, with one of his small chil-
dren, Paul by name. Mrs. Ashby reclined on the bed.
for a while, talking with her husband; the child mean-
while playing on the bed. As soon as the child went to
sleep she arose and went to her own bed and retired. In
this bed three children slept with her, one of them, Rita,
a child, at that time, 10 or 11 years of age. She slept
with her head turned to the foot of the bed. Raphie, the
oldest girl, about 13 years old, slept with another one of
the young children in a bed in the southwest corner of
the room. Raphie remained awake longer than any
other member of the family, sitting up to study her les-
sons. It is not shown what time she retired.

About 3 or 4 o'clock of the morning of the day already

mentioned, Rita, sleeping in her mother's bed, as stated, was awakened by fire. She says that she thought she was first to awaken, but that her sister Raphie said that she awakened first. Raphie was not examined. When Rita awoke, she saw that portion of the bed on which her mother lay was on fire; also, the stairway, which was at the head of the bed. She made an outcry, and endeavored to awaken her mother. Her mother lay upon the front side of the bed. She caught hold of her mother's hand, and tried to arouse her, but without success. Plaintiff in error then came to the bed and caught hold of the bed tick and began to pull it as if to draw it towards the door. He pulled it apart where it was burnt in two. It is not proven that he spoke to his wife or endeavored to arouse her in any other way than as just stated. He could easily have picked her up and conveyed her to the outside, or at least dragged her. It does not appear what her weight was; but we infer from the testimony that she was not a large woman, and was not robust. When the bed tick pulled in two in the manner stated, he seems to have abandoned all further efforts to save his wife, or her body, if she was then dead, but proceeded to save such furniture and household belongings as he could. Rita says he took out a chair. There were some bed clothes saved, one or two bed ticks scorched, and a sewing machine. In the meantime all the children had gotten out. He went to the outside and hallooed and called to neighbors. One of his neighbors came immediately, Mr. Dorse Crabtree. He asked Mr. Crabtree

if he reckoned he could save his meat in the smokehouse. Mr. Crabtree said he didn't know, and Rita spoke up and said, "No, Papa, the key is in the house." Plaintiff in error said a log might be removed; however, he solved the matter by taking his axe and breaking in the door of the smokehouse. He and Mr. Crabtree then took out all the meat and moved it to a safe place.

When Mr. Crabtree reached the scene of the fire he asked if all the family were out. Plaintiff in error replied: "All but Pearlie." Mr. Crabtree exclaimed, "Lord a'mercy, Phillip!" There is no evidence that plaintiff in error, at this time, exhibited any emotion whatever, or made any remark further than has just been stated.

In the meantime other neighbors came in. When the roof had fallen in, and burned away, the body of Mrs. Ashby could be seen, or what remained of it unconsumed by fire. It was suggested by one of the neighbors that they draw water from the well and pour it upon the fire so as to rescue the body. This was done. Many tubs of water were poured upon the fire. It does not appear that the plaintiff in error assisted in this matter at all. However, when the fire was sufficiently extinguished at the point where the body lay to enable the people around to draw it out, plaintiff in error reached forward as if to catch the bed springs on which the body of his wife lay to draw them away from the fire. He was warned that his hands would get burned and desisted. A pick was then used, and the bed springs were drawn forward

with the partly consumed body lying upon them. It appears that she was lying upon her left side. The left leg was burned up to the body; the right leg to the knee, or possibly a little above. The arms were burned off. A considerable part of the trunk remained unconsumed, at least the viscera. The head was all burned away except a part of the skull at the back of the head where the coil of her hair rested. This piece of skull, the witness say, was about the size of the palm of a man's hand, and attached to it was a bunch of hair about as big as a man's fist. This was matted with blood, or, as one of the witnesses says, "It was all in a gore of blood." One of the witnesses spoke of the blood as having a "fried" appearance.

A coffin was procured, and all that could be found of the body was interred on the afternoon of Saturday, which was the 13th. Some days afterwards—on the 19th—the body was exhumed and an inquest held. On this occasion the piece of skull with hair attached above referred to was examined by Dr. Pritchard. He testified that the substance that matted the hair together was blood.

On Sunday, the 14th, one of the witnesses discovered a hammer lying under the side of the bed, or where the bed of Mrs. Ashby had been. This was an ordinary shop hammer, weighing about two pounds, with two facets or hammer heads, one square and the other beveled. The handle had, of course, been consumed by fire.

Rita testified that the place for the coal oil can was in

the kitchen, and that she did not see it anywhere in the sleeping room that night, but she says that Raphie told her (to which there was no exception) that she saw it. Whether she saw it when the fire was in progress or be- fore they retired does not appear.

When the neighbors came in and an opportunity arose, they asked how the fire occurred. One, either plaintiff in error, or one of his children, said that the lamp must have exploded. It does not appear from the evidence which one made this remark. However, it was made in the presence of the plaintiff in error.

It does not appear affirmatively whether there was any fire in the fireplace, but most probably there was not, as Rita says it was a warm August night.

As to the lamp, Rita indicates that the custom was to blow it out. If it was left burning that night, the fact could have been proven by Raphie, the oldest daughter. She was not examined. The evidence shows that she and the older children had been taken to Missouri by their uncle, a brother of the plaintiff in error, after the death of their mother, and that Rita had been brought back to testify, but not Raphie. Rita says in her testi- mony that Raphie was not well, but that she was sitting up some. No reason is given why her deposition was not taken.

There is no fact in the evidence indicating how the house could have caught fire accidentally.

We shall now recite in rapid summary the facts above referred to which we think sufficient evidence of the

*corpus delicti* to justify the introduction of the confessions.

There is no doubt that Mrs. Ashby is dead. It is fair to presume that she was either dead or unconscious when Rita discovered the fire, because the latter called to her mother, and pulled her hand to arouse her, but could not. At this point a peculiar fact appears that the fire was on that part of the bed—the front side of the bed—where Mrs. Ashby lay. It does not appear to have been on the other part of the bed where the children lay. The hammer was under the side of the bed. The piece of skull already referred to with hair attached to it, matted with blood, was found after the fire. The coal oil can was in an unaccustomed place. The plaintiff in error acted strangely in not endeavoring to arouse his wife, or to remove her from the bed, but contented himself with pulling the bed tick in two that she lay on; this being rendered possible by the fact that the fire had burnt it so that it could be easily separated. He gave no further attention to his wife, but began to save the furniture and other belongings. The language he used in speaking to Mr. Crabtree, in reply to a question from the latter, saying that "all had been saved but Pearlie," and showing no grief. The fact that he did not mention to Mr. Crabtree the loss of his wife before he was asked. His ostentatious conduct in rushing forward to seize the hot bed springs, when he had previously given no aid in carrying water to quench the fire and rescue the body.

There was no evidence that he at any time afterwards showed any emotion until his confession was made. No

124 Tenn.—45

one testified as to having seen him shed a tear, or utter an outcry of anguish, or give expression to any sense of loss. The only sign of any emotional disturbance was that, as one of his neighbors said, "He seemed bothered;" also, that he ate no breakfast Saturday morning, or refused breakfast, and that he seemed to eat little at other meals afterwards.

There is one other circumstance which is worthy of mention. After the body was withdrawn from the fire and was outside upon the bed springs, he crouched down by the side of the fence with his hands over his face, sometimes lifting his hands and looking under them at the poor remains of his wife, and sometimes raising one of his elbows and looking under that. The impression we get of this, as described by one of the witnesses, is that these movements were furtive.

These facts we think indicate that Mrs. Ashby came to her death by violent means, and that the fire was started for the purpose of consuming her body and concealing evidence of the crime. They indicate the husband as the guilty agent, as no one else was at the house who could have committed the deed.

We think these facts constitute sufficient evidence of the *corpus delicti* to justify the introduction of the confession.

On Monday afternoon, July 15th, plaintiff in error went to the house of Dorse Crabtree, his neighbor, to borrow a saddle. He said he was going to his brother Daniel's house to see how his children were getting on.

A saddle was lent him. He put it on one of his mules and rode to Camden, the county seat, taking an unfrequented and circuitous route thither. He went to the store of Mellon Fry, whose tenant he was, and called for him. Mr. Fry was not in, but soon came. Mr. Fry has since died, and his evidence was not taken in the cause. What transpired in the storehouse of Mr. Fry is thus stated by Mr. Corbett:

"Q. When he came to the store, did you have a conversation, or hear him make a statement, with reference to his dead wife? A. Yes, sir. Q. Was that before he went to the jail? A. Yes, sir. Q. Did he make a statement as to how his wife came to her death? A. Yes, sir. Q. Tell the jury what he said, how he said it, and all about it. A. He said he killed her. Q. Did he say how he killed her? A. He said he done it with a hammer. Q. Did he say where she was? A. In bed. Q. Just commence and tell the jury all he said about it. A. Well, he just simply said that—Mr. Fry asked him first how he killed her. Q. Tell it all, how the conversation was, how it came up, and all about it. A. When he came in the store, Mr. Fry called me into the store, and Mr. Ashby went to the rear of the store after some water. I told him the water was in the office, and Mr. Fry stepped back and said Phillip came down and confessed to killing his wife, and I said, 'Certainly not,' and he says, 'Yes, he said he did,' and he went on, and, after drinking some water, Mr. Fry asked him to have a seat in the office, and he asked him how come him to do it, and he

said he didn't know hardly, and I asked him if anyone suspicioned he had done it, and he said 'not a living soul' that he knew of, and he said : 'Nobody don't know where I am; I came around the upper way to keep from meeting anybody.' And Mr. Fry asked him—I don't know which one, him or me—how, and he said partly with a hammer, and we asked him the particulars, and he said he caught her by the throat with his hand and struck her in the head with a hammer, and we asked if she hollowed, and he said no, he didn't think she ever knew what struck her; and I said, 'Phillip, maybe you have thought about that and imagine you done it,' and he said, 'No, I might have been wrong when I done it, but I know I done it,' and he said he wanted an officer so he could go to jail, and Fry tried to pursuade him not to do it, as the sheriff or jailer was not here; but he said, 'I want to give up and suffer the penalty,' and then I went and got Mr. Wilson, and he said he wanted to give up, waive examination, and go to jail, and then Mr. Wilson asked me to come down, and I went in and told Mrs. Woods what he wanted, and she said he had been there and she had told him she couldn't put him in jail, and I told her that maybe Mr. Wilson, being an officer, could put him in, that he wanted to go, and she gave him the key and we put him in jail, and after he had gone in jail Mr. Wilson asked him if he had anything in his pockets, and Wilson went to examine him and found some money in his pocket, and Phillip asked him if he wanted that, and Mr. Wilson said, 'No,' he wanted to see if he had any

knife, and Phillip said, 'No, nothing like that; and he just remarked, 'This is a pretty bad place,' and the next morning Mr. Fry and me went down and had a conversation with him, and that was the last seen of him. The next morning he still said he had killed her; and he said the next morning he wanted to be examined by a doctor and if he was all right he didn't ask any mercy at all. Q. What did he want to be examined by a doctor for? A. To see whether he was right or not. The conversation next morning was pretty much on the same line, only Mr. Fry asked some questions if there was any other woman he wanted or anything like that, if there was any other woman mixed up with it, and he said there wasn't, and then Mr. Fry asked him if he didn't think he would kill his wife and burn up his children and get rid of them and then get with some other woman, and he said, 'I told you no man or woman knew anything about it,' that nobody knew it but him and God. Q. Fry asked him if he didn't intend to get rid of his wife and burn up his children and get with another woman? A. Yes, sir. In the conversation he said he coal-oiled the house and set fire to it and got in bed, and Mr. Fry asked him if he intended to burn up his children, and he said, 'I thought we would all go up together.' Q. That was his statement about it? A. Yes, sir; that is all I know, just what he stated."

On cross-examination the witness was made to repeat, in response to various questions, in substance what he had already stated, and also the following:

"I will ask you whether or not, in your opinion, from the way he talked or acted that night, whether he was a man of sane or insane mind? A. He seemed to talk like a sane man. Seemed to know everything about it. Q. Did you regard him as having a sane mind? A. After I talked to him. . . . . What was his condition? Was he nervous? A. Yes, sir; he seemed to be nervous. I noticed more than anything else that he kept getting up drinking water, seemed to be thirsty. Q. What was his condition otherwise? Did he sit down in the store? A. Yes, sir. Q. Did he go to sleep? A. Yes, sir; he went to sleep. Q. While there talking to you he went to sleep? A. After I went after Mr. Wilson he sat there asleep—looked like he was asleep. Q. Hadn't you seen him sitting there in that condition before that time? A. I don't remember now whether I did or not. I seen him asleep though. He seemed to nod. He said he was asleep. . . . Q. After you had heard him talk, what was your opinion as to whether he was sane or knew what he was talking about? A. He seemed to know what he was talking about. He convinced me that he was telling the truth about it. Q. Did you say he said he hadn't realized what he had done, or hadn't any remorse of conscience? A. He said he didn't have any remorse of conscience until that day; it came to him sometime that day."

The witness Morrison made the following statement regarding a confession to him (this was in the jail on Tuesday, the next day after he had talked to Mr. Fry and Mr. Corbett):

"Q.  Tell the jury what he said; use his words.  A. I
said, Phillip, how come you here, are you guilty of what
you are accused, of killing your wife?'  And he said,
'Will, I certainly am, I think.'  That is the way he an-
swered. . . .  At this conversation at the jail, after the
fire, did the defendant undertake to go into details, tell-
ing how he killed his wife?  ·A.  No, sir; he didn't tell
me how, but a man standing by me asked the question,
and he told him.  Q.  Did you hear him?  A.  Yes, sir.
Q.  What did he say?  A.  He told Dock Johnson—there
were several standing around us.  I think Dock Johnson
was the man.  Q.  Tell what  the  defendant said.  A.
He said, 'What did you kill your wife with?'  And he
said, 'I killed her with a hammer.' "  He further said the
following matter:  "I did ask him one more question.  I
said:  'When you set your house on fire, did you intend
your little children to burn up?'  And he said:  'I did.
I aimed for us all to go together.' "

On the next day, Wednesday, the plaintiff in error
also talked with the sheriff, Woods, about it.  The sheriff
says:  "He just simply told me that he had made a con-
fession to my wife, and then he went ahead and told me
what he had confessed to her."  "Q.  What was that?
A.  He had murdered his wife.  Q.  Use his words—tell
what he said and everything about it.  A.  I asked him
how he came to do it, and he said he didn't know, and I
asked him when did it occur to him that he was going to
do that, and he said he didn't know that, and I asked
him how it come up, and what did he do the evening be-

fore.  He said when they went to bed that he and Paul were lying down on one bed, and Pearlie came and lay down with him, and Paul played there some bit, and went to sleep, and when Paul went to sleep Pearlie got up and went to her bed; that was his wife.  He said he dropped off to sleep, and in the night some time he got up and took a hammer, and taken his wife by the throat and hit her on the head, and picked up the coal oil can and coal-oiled her and the bed and the house, and then set the house on fire, and then went and laid down.  I asked him then did he intend to stay in the house, and he said, 'I aimed to all go together,' and I asked him why they didn't, and he said his little girl Rita waked up, was the cause he reckoned that they didn't. . . .  Did he say anything about what his wife did when he struck her, whether she was awake or asleep?  A.  She didn't do anything except throw up her hands that way, and they trembled.  Q.  How many licks did he say he struck her?  A.  Twice.  Q.  Did he say where he hit her?  A. Yes, sir; on the head.  Q.  He told you he didn't know why he did it?  A.  Yes, sir; told me he didn't know why. Q.  He told you he didn't know when the idea came into his head that he would do it?  A.  Yes, sir; he told me he didn't know that.  Q.  Did he tell you how long it was after until he got to feeling guilty?  A.  He never felt any guilt until Monday about 12 o'clock, and got on his mule to make a confession to me, and I wasn't at home, and he came and told my wife.  Q.  Did he say the Lord brought him?  A.  He said the Lord led him.  Q. The Lord led him to the jail?  A.  Yes, sir."

We think the evidence makes out clearly and fully the guilt of plaintiff in error.

It has been argued that the plaintiff in error was of unsound mind.

There is no evidence that he had ever shown any symptoms of mental aberration before this occurrence. There was nothing in his conduct when the neighbors came and he was assisting them to get his property out of the fire. There was no evidence of any such aberration during the residue of the day Saturday, nor Sunday, nor on Monday, prior to the very moment he made his confession. He made careful preparation for his trip to Camden. He borrowed a saddle from one of his neighbors on the pretense that he was going to his brother Daniel's to see how his children were getting along, thus concealing his purpose of going to town. He proceeded to town by an unusual and unfrequented route so that he would not be intercepted or interrupted. He did not confess to one of his immediate neighbors, but went first to the jail where he thought he would be safe. Not finding the jailer at home, and his wife refusing to receive him in the jail, he went to see the man from whom he was renting land and made the confession to him, and subsequently to the three parties whose names we have already stated. The statements contained in the several confessions are clear and connected, and the three confessions are substantially alike. The only thing in the confession that seems to give any hint of mental unbalance is his statement that his purpose was that his wife and children and him-

self should all go together; but this seems to have been suggested to him by the questions asked him by the persons to whom he was confessing.

Insanity cannot be predicated on his statement that the Lord led him to the jail, to give himself up. He claimed to be a religious person. He had recently been taken back into his church. The evidence does not show, but we suppose there must have been a previous suspension or expulsion. It is not uncommon for religious persons to believe they are directed by the Lord. There are many illustrations in history of persons who believed they were so directed—eminent men and women whom no one ever thought were mentally unbalanced. Nearly all ministers of the gospel believe they are directly called to their work by the Lord.

In this same connection we should reproduce the letter which plaintiff in error wrote to his sister-in-law, Mrs. Delphia Ashby, Wednesday, the 17th of August. It reads as follows:

"My dear and loving sister and family. It is with a sad heart that I try to write you a few lines concerning my little ones. Delphia, I am afraid that I will never get to see Raphie any more on this earth, but if I never meet her on earth again I believe we will strike hands around God's throne where there will be no parting, but where all is peace and joy and happiness. Delphia if I had of went to taking medicine when you and Pearlie wanted me to I don't believe this trouble would ever come. Delphia, I never felt my guilt until the day I left

your house; it all come to me that day what I had done,
and of course God directed me to this place to receive my
just dues.   Delphia you know that I always loved my
wife and little ones as dear as my own life, but it looks
like that it was ordered that this trouble should come.
Delphia, I never in all my life felt like I wanted to be a
murderer, but what made me do this I do not know.
Delphia, that I am closed in prison bars I want your
prayers, and I trust I will get them.   Delphia I want
you to rite to me and let me know how you all are get-
ting along.   Kiss all the little ones for me, and rite and
let me know how they are getting along.   I don't guess
we will ever see each other in this life but give them my
love.   Rite soon, your brother."

The principal part of the letter is covered by the com-
ment which we have just made as to his statement that
he was led by the Lord. Of course, such a belief may be
so extreme as to amount to insanity.   There are several
instances of this kind in our reports where persons have
said that the Lord directed them to commit this crime,
and that, and the other; but the direction which the
plaintiff in error claimed when he made his confession
was in the line of repentance for an evil deed, and was
such a direction as one might believe he had received
without dishonoring the Great Ruler of all.   We have
reproduced those confessions.   They show a deep sense
of guilt, and a sense of repentance and remorse.   In the
letter which we have just copied there is the sound of a
new note, an indication that he desired to excuse him-

self.  He says: "Delphia, if I had of went to taking medicine when you and Pearlie wanted me to I don't believe this trouble would have ever come."  The witness Delphia Ashby says that this refers to a pain which he complained of having at the back of the head, for which he recommended a poultice.  Another indication of the new note is: "Delphia, you know that I always loved my wife and little ones as dear as my own life, but it looks like that it was ordered that this trouble should come.  Delphia, I never in all my life felt like I would like to be murderer, but what made me do this I do not know."  Here is an indication that he is endeavoring to throw upon the Lord a direction to him to commit the crime. We do not know what effect his brooding upon his crime in the solitude of his confinement in the jail may have had upon his mind after the deed was committed; but, as we have said, we do not believe that he was of unsound mind at the time that he killed his wife; nor are we able to say that this letter itself indicates that he was of unsound mind.  He had conceived the thought that he was under divine direction for an innocent purpose; that is, for confession of a crime committed and for expiation by receiving the punishment of the law. Pursuing this thought, he seems either to have formed the intellectual conception that perhaps the whole series of events was ordered by a higher power, or it may be that he was merely endeavoring to excuse himself in the eyes of his sister-in-law.  We must say for him, however, that the record bears out his statement in the letter that he

was kind to his wife and children, except in the matter of the episode with Mrs. Lafferty which we shall refer to later.

It is no indication of insanity that a feeling of remorse did not attack plaintiff in error's conscience until Monday. If he had been a hardened criminal he might have gone through succeeding years, or all through life, without any such feeling; but he was not. No other murder or act of violence had ever before been committed by him. He was, aside from one circumstance to be hereinafter rerated in connection with the question of motive, a reputable citizen, a good neighbor, and a man faithful to his contracts, or, as the witnesses say, "good for his contracts"; and, as we have seen, he was, or thought he was a Christian man. That he should suffer remorse under these circumstances is no ground for wonder or surprise. That he should not have suffered remorse earlier is not surprising. Having reached a state of mind that made him capable of committing the crime, the only question was whether he should ever feel remorse. If felt, the interval between the commission of the crime and the accession of the feeling of remorse would be different individuals, according to their diverse temperaments and personal history. It may be true, and probably is true, that on Sunday and Monday, when he got time for introspection and retrospection, and had had time to miss the presence of his wife, and remembered her as the mother of his innocent children, and as the faithful companion of his daily life for so many years, the horror of

his deed so pressed upon his conscience that he was compelled to cry out in confession, feeling relief in this, and even in anticipation of the punishment which he believed he merited for his act. This is all a matter of natural, mental process.

The enormity of the crime is no ground upon which to predicate the unsoundness of mind. The annals of crime are full of such occurrences among people never suspected of mental unbalance. We have within recent years had many instances before this court. We need mention only a few. There was a case in Tipton county in which the evidence showed that a man crept to the window and shot his wife as she sat upon the edge of the bed with her small children about her. There was a similar case recently before the court from Wilson county where a man shot his wife through the window. There was a case some years ago from Hardeman county wherein a man shot his wife as she was crouching behind a barrel trying to escape from him. There was a case some years ago from Franklin county where one man hired two other men to kill an old man and his wife for $5. The old man was walking down two potato rows showing one of the men his potatoes, believing him to be a hunter who had just dropped into his home on the mountain side. While he was thus showing hospitality, the supposed hunter placed the muzzle of a shotgun between the old man's shoulders and fired off both barrels. About the same time his companion in the crime shot the wife of the old man and set the house on fire, burning up her

body. All of the persons referred to were sentenced to death by this court.

It is said that there was no motive in the present case.

The absence of apparent motive is not a sufficient basis on which to predicate a conclusion of innocence. No one can fathom the recesses of the human heart, or say with certainty why this or that man did thus and thus. Crime is itself illogical. It is a divergence from the ordinary course of civilized life. It is contrary to the principles that control that life, and, as for as it goes, tends to break down and destroy civilization. It is against the current of the general life. It is anti-social; but it is constantly occurring. It is one of the most familiar facts in the daily history of the world. It is not so strange a thing therefore that we must feel able to assign a motive for the commission of an act before we can charge criminality.

However, in the present case there is evidence indicating a motive.

Some seven or eight years prior to the present occurrence, plaintiff in error left his wife and eloped with a Mrs. Lafferty, the wife of his brother-in-law; that is, the wife of his own wife's brother. They remained together in Alabama about a month. He then returned to his home, and his wife received him; and Mrs. Lafferty returned to her home, and her husband received her. Plaintiff in error, however, had not forgotten her during these years. The witness Morrison says that plaintiff in error told him about a year before he killed his wife that he still loved Mrs. Lafferty; that she was the most

affectionate woman he ever saw. During the week preceding the day of the murder, he had been engaged in hauling on the same farm where this woman lived. It is not shown that he had seen her. The road on which he hauled did not carry him nearer than a half a mile to the place where she lived, but he had made arrangements to go and board in another house on the same farm, during perhaps the following week; at all events, quite soon. His wife seemed to be a person of feeble health. One of the witnesses says that she was taking medicine for consumption. We do not know what effect his nearness to this woman had wrought upon him. The fact that he still loved her, and that he had in mind her affectionate demeanor towards him, would indicate that the old passion had been again aroused.

This motive, it is true, is only conjectural; but we believe it to be a reasonable conjecture.

At all events, whether this motive be correctly assigned or not, or whether there was any apparent motive, we believe the evidence, as we have already stated, makes out a clear case of guilt, and that the jury acted correctly upon the facts.

The following errors of law are assigned: The trial judge excluded the evidence of Drs. Bradley and Hudson on the ground that, among other reasons, they had not qualified as experts. These physicians were introduced, and the following question was propounded to them as experts:

Ashby v. State.

"If a man without apparent or no cause, while sleeping in his family room with his wife and six children, should arise some time in the night and with a hammer—a shop hammer—strike his wife over the head twice, killing her, while sleeping, and then pours coal oil over the bed upon which his wife and children were lying, and over the room, and sets it afire, and goes back to the same bed in the same room with the intention of burning himself and all of his family up, and was prevented from doing so only by the cries of his children, would you or not regard this man as sane or insane at the time of the act?

It was agreed that, if allowed to answer this question, each of said witnesses would have stated that his opinion, based entirely upon this question, and taking all therein stated as true, would be that such a person was of unsound mind.

The question was objected to in each instance because the doctor did not qualify as an expert.

Dr. Bradley testified on this subject as follows: That he had been a practicing physician since 1886, but that his experience in the treatment of persons mentally affected had been very limited that he had read some works upon diseases of the mind; that he was a graduate of the University of Louisville; that he had only two or three cases where the mind had been affected in the course of his 24 years' practice; that these were instances of persons who were maniacs. The examination then proceeds:

"Have you had more cases than two or three of mental diseases where they were not so much deranged as mani-

124 Tenn.—46

acs? A. No, sir; I can't call to memory any now. Q. Have you ever been called on to examine people who were being examined with reference to their people who were being examined with reference to their mental condition. A. Yes, sir. Q. You have been called in to do that as a physician? A. Yes, sir. Q. And that is more than your two or three cases? A. No, sir; that will cover them. About three cases; that is all I think of now. Q. You have read boods that treat of mental cases? A. Yes, sir; but I have not read up very well on that. Q. You have read some? A. Yes, sir. Q. You have heard lectures on that character of diseases? A. Yes, sir. Q. And you have treated some people for that disease. A. Yes, sir. Q. What books have you read upon that subject, if you remember the authors—standard works? A. I have read some, but I can't call to memory now to save my life. I have them in my library, but I can't call their names just at this time. I have a very limited experience."

We think that the trial judge acted correctly in declining to receive evidence of this witness as an expert on insanity.

Dr. Hudson, the next witness referred to, testified as follows:

"How long have you been practicing medicine in Camden? A. About 16 years. Q. How long have you been practicing altogether? A. Forty-three or 44 years. Q. Are you a graduate of any school? A. No, sir. Q. You have no diploma? A. No, sir. Q. Have you had any experience in treating people for insanity? A. Very little,

if any.  Q. You have had some?  A. I have had very lit-
tle.  Q.  How many cases have you examined?  A. The
experience I have had has been with people affected with
other troubles;· for instance, typhoid fever  and  other
troubles that produce that.  I have never prescribed for
a real insane person. Q. You have read treatises on insane
diseases?  A. Some.  I have never made a specialty of
it. . . .  Q. What books have you read upon the sub-
ject of mental disorders?  A. Prof. Hall, Morsey, and
Hunt, and some others. Q. You have them in your libra-
ry? A. Yes, sir. Q. Have you given any special investiga-
tion to mental diseases? A. No, sir; I have not, I have not
made any specialty of it.  Q. Do you regard yourself as
well posted along the line of mental diseases as you are
in general sickness, such as typhoid fever, pneumonia,
and things of that sort?  A.  I don't regard myself as
well posted on that as I am on general diseases."

We think this witness also fails to show that he was an
expert.

The following evidence was offered in the testimony
of Delphia Ashby, and was ruled out as incompetent:
"Q.  Do you know whether or not she" (the deceased,
Mrs. Pearlie Ashby) "had ever had any spells, day or
night, smothering spells, or anything of that kind?  A. I
know she said she did, one night.  I wasn't there; I was
at church. Q.  You were at church at the time, or at time
she told you?  A. I was at church at the time,  I wasn't
at  church when  she  told  me.  Q.  After  you  had
a conversation with her about it, did you yourself

observe any effects upon her person? A. She wasn't complaining of having the spell at that time, but was complaining about the spell she had Wednesday before that. Q. Now, go ahead and tell what it was that Mrs. Ashby said about her spell that she had? A. They had all gone to church, and she said she went to church the next night because she didn't want to stay there; that she had a curious kind of spell and couldn't raise up when she woke up, and she said she was afraid she would get so she couldn't raise up; that she had such a curious spell and couldn't raise up. Q. That was on Thursday night before the house burned? A. She told me this on Thursday. Q. When was it she said she had the spell? A. Tuesday night. Q. Before Thursday night? A. Yes, sir; the church broke up Wednesday night, and she went Wednesday night."

We think this evidence was properly excluded as mere matter of hearsay; that if the witness had seen Mrs. Ashby have such a spell, that would have been competent; also, what she said as to her symptoms during such spell; but not the mere narrative of a past occurrence.

The foregoing covers all of the errors assigned. None of them being well taken, we are of the opinion that the judgment of the trial court must be affirmed.

MR. JUSTICE BUCHANAN, is of opinion that the facts recited show that plaintiff in error was of unsound mind when he killed his wife, and on this ground dissents from the foregoing opinion.