# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON

Assigned on Briefs November 10, 2009

## STATE OF TENNESSEE v. JONATHAN RANSOM

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-05863      James C. Beasley, Jr., Judge**

---

**No. W2008-02241-CCA-R3-CD  - Filed February 11, 2010**

---

The defendant, Jonathan Ransom, was convicted of second degree murder and sentenced to twenty-five years as a Range I, standard offender.  On appeal, he argues that the evidence was insufficient to sustain his conviction.  After careful review, we affirm the judgment from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J.C. MCLIN, JJ., joined.

Lance R. Chism, Memphis, Tennessee (on appeal); and Robert Wilson Jones, District Public Defender; and Robert Felkner and Glenda Adams, Assistant Public Defenders (at trial), for the appellant, Jonathan Ransom.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The victim, Daphney Rogers, was murdered in her home after her husband left for work on July 25, 1988.  Almost nineteen years later, the defendant was arrested for the murder after he turned himself in at a Memphis police station and confessed that he killed the victim to exact revenge on the victim's husband.  The defendant pled not guilty to the murder.  On July 24, 2008, following a jury trial, the defendant was found guilty of second degree murder.

At trial, the victim's husband testified that in 1988, he and the victim lived at 1066 Pendleton with their two children. On the day of the murder, their oldest child was with his mother-in-law, and the youngest child was at home. The victim was to spend the day packing because they were moving to a home that they were purchasing. The victim's husband was working on construction at the Park Place Mall and called home at approximately 10:00 a.m. but did not receive an answer. He phoned home again at lunchtime, and a man answered the phone. The man identified himself as the police and told him that he needed to come home. He left for home and found the lawn full of police and the victim's family members. The police prevented him from entering the home and took him downtown where he was interrogated. He was questioned several times before his communication with the police stopped for an eighteen-year period until the defendant came forward.

The victim's husband identified the defendant and said that, at the time of the murder, he had known him for approximately five years. He testified that he and his wife socialized with the defendant and his wife. He said that he occasionally smoked marijuana on the weekends but did not smoke in the presence of his wife. On one occasion, he was with the defendant in a truck belonging to the defendant's father. The defendant and the victim's husband went to a place where he had previously purchased marijuana. The seller approached their truck, but a police car pulled in behind them before they made the transaction. He said the seller threw the marijuana into the truck. They were all handcuffed, transported to 201 Poplar, and placed under arrest. His wife posted bond for him and the defendant. The victim's husband hired an attorney, and the defendant asked if the attorney could represent both of them. He said they never had an argument about who would claim the marijuana. He said the drug case was eventually dropped.

The victim's husband went to the defendant's home on the day after the murder. He asked if the defendant had heard about the murder, and the defendant responded that he had. He said that was about the extent of their conversation. The defendant came to the victim's funeral.

On cross-examination, the victim's husband said that he and his wife possessed the only two keys to the house. He said the defendant visited his home on one occasion some time after the murder, but it was an awkward visit because he had cut ties with most of the people he was around at the time of his wife's murder. The defendant told him that he got his address from his mother.

The victim's mother testified that the victim was her oldest child. She said that the victim's daughters were now twenty-six and twenty-three, respectively. She testified that the victim worked at Goldsmith's on Main Street in Memphis at the time of her death. She said

that she was going to the victim's home to help her pack on the day of the murder because they were moving that week to a new home. She was unable to reach the victim and, when she arrived at her home, the door was locked. The three-year-old child came to the door and tried to open it. The child told her that the victim was sleeping and would not open the door. She asked the child to go to the window so she could see her. She got a neighbor to kick in the door. When she entered the home, she went over to the couch and the victim. The victim was lying with her head to the back of the couch with a towel around her neck. When she moved the towel, she saw blood and threw the towel. She took the child and sat and held her. She asked that the man who helped her gain entry into the house call the police.

After the police arrived, the victim's husband called, and the police answered the telephone. They told the husband to come home. The victim's mother did not speak with the victim's husband. The police would not allow the husband to enter the home when he arrived. She said she knew the defendant through the victim and her husband.

The victim's mother said that the victim's husband screamed and cried when the police told him that the victim had been murdered. She recalled that he ran into the hedge and started hitting his head against the wall of the house. She testified that he was very upset. She identified the defendant in the courtroom.

Next, Jimmy Cushman testified that he was with the Crime Scene Unit of the Memphis Police Department that responded at the murder scene. They arrived at the scene at approximately 11:45 a.m. He identified a photograph of the inside of the house as one that he had taken on the day of the crime. He did not observe signs of a forced entry into the home. He also identified a photograph of the living room area of the house with the victim's body lying on the couch. He said that the victim was laying face down on the couch with her hands behind her back. There was blood on the floor and on the wall above the couch where the body was located.

Dr. O'Brian Cleary Smith testified that he was the medical examiner for Shelby County in 1988 and that he performed the autopsy of the victim. He also went to the victim's home, examined the victim's body as she was found, and prepared her body for removal to the location where the autopsy would be performed. He testified that the victim died as a result of twenty-seven stab wounds. The diagram in the record showed that she sustained wounds to the chin, neck, left side of her torso, chest, and abdomen. She was also stabbed through her upper arm and in the back. Two wounds to the victim's chest went into her heart and would have been capable of producing death very quickly, but he was not able to say which of the victim's wounds occurred first.

On cross-examination, Dr. Smith testified that some of the records from this case were missing. He did not observe any defensive wounds on the victim and said it was possible that she was attacked by someone that she knew.

Next, Ron Trentham with the Memphis Police Department testified that he was working in the Mount Moriah Precinct in March of 2007, when the defendant walked in and confessed to the victim's murder. He stated the defendant was "hollering and screaming" when he ran in, had tears running down his face, and looked disheveled. The defendant did not appear to be intoxicated or on drugs when he turned himself in. The defendant told Trentham that he stabbed Daphney Rogers to death nineteen years earlier. He also told him the street where the murder occurred. They contacted the felony response detectives to track down the old case.

Trentham testified that the defendant told him he was confessing because he had a lot of problems in his life that he attributed to having the murder on his conscience. He said the defendant's demeanor changed after he was arrested and that he appeared to be more peaceful. On cross-examination, he acknowledged that he did not advise the defendant of his rights or record any of the things that the defendant told him.

Next, Lieutenant Donald Crow testified that he was with the Felony Response Investigative Unit for the Memphis Police Department. He said that the defendant was brought to him after his arrest in March 2007. They received a call that said the defendant had confessed to a twenty-year-old homicide. They sat down with the defendant and determined that he was neither under the influence or intoxicated. Before they interviewed the defendant, they advised him of his rights and had him execute a waiver of those rights.

The defendant told the officers that he killed the victim in a house on Pendleton Street in the early morning hours to get back at her husband because they had been involved in a drug arrest. He said he did not remember how he killed the victim. Lieutenant Crow testified that they spoke with the defendant for approximately twenty minutes. They did not question him further because they did not know anything about the homicide and needed to review the facts of the case.

They eventually located an unsolved July 25, 1988 homicide in their computer. The file indicated the victim was killed on Pendleton Street at approximately 6:30 a.m. The defendant's criminal history reflected a drug arrest on February 19, 1988. The defendant was not in jail on the date of the murder. They searched the criminal record for the victim's husband and saw that he also had a drug arrest on February 19, 1988. They felt that there was enough information to proceed with the investigation and that the defendant was not making a false confession.

Sergeant John Oliver testified that after reviewing the case file, he and another officer interviewed the defendant and asked him to tell them about the homicide. The defendant told them that he had killed the victim in 1988 at her home on Pendleton. He was angry at the victim's husband for getting the defendant arrested earlier that year. The defendant told them that he was not going to give them details because he did not want to help the police with their investigation, but he wanted to confess to the murder because it haunted him. He also told the police that the victim's husband knew that he was the murderer. After he gave his statement, the defendant told police that he felt a lot better and was relieved that a large weight had been lifted off of him.

The defendant testified that he went to the police because he had been using drugs for three or four days. He claimed that he turned himself in to prove that he did not commit the murder. He acknowledged that he told the police that he killed the victim but denied that he told them that he stabbed the victim. The defendant testified that he confessed because the victim's husband told the defendant's girlfriend that he killed the victim and that the defendant wanted to prove that he did not commit the murder.

The defendant was convicted of second degree murder and sentenced to twenty-five years.

Analysis

On appeal, the defendant argues that the evidence is insufficient to sustain his conviction for second degree murder. Specifically, he contends that the State failed to adequately corroborate his confession.

When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Brewer*, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State,* 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. *Id.* In *State v. Grace*, the Tennessee Supreme Court stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *Grace*, 493 S.W.2d at 476.

The *corpus delicti* of a crime may not be established by a confession alone. *Ashby v. State*, 124 Tenn. 684, 139 S.W. 872, 875 (1911). The *corpus delicti* of a crime requires that the State prove two elements: (1) that a certain result has been produced, and (2) that the result was created through criminal agency. *State v. Ervin*, 731 S.W.2d 70, 71-72 (Tenn. Crim. App. 1986). To establish the *corpus delicti* for a homicide, the State must prove the death of a human being and that someone is criminally responsible for this death. *State v. Shepherd*, 902 S.W.2d 895, 901 (Tenn. 1995). The elements of *corpus delicti* may be established by circumstantial evidence. *Ervin,* 731 S.W.2d at 72. Furthermore, the question of whether the State has sufficiently proven the *corpus delicti* is a question for the jury. *Id.* at 71. "Only *slight* evidence of the *corpus delicti* is necessary to corroborate a confession and thus sustain a conviction." *Id*. at 72 (emphasis added).

At trial, the State proved that the victim was murdered and that the defendant was criminally responsible for her death. The victim was stabbed twenty-seven times in her home. There were no signs of forced entry into the home, and the victim sustained no defensive wounds. This evidence lends itself to a reasonable conclusion that the victim was killed by someone she knew. The defendant's confession and the testimony at trial from other witnesses established that the defendant knew the victim and that he and the victim's husband were friends. Approximately five months prior to the murder, the defendant and the victim's husband had been arrested together for an offense involving drugs. The victim posted bond for both men following their arrest. The defendant was angry with the victim's husband because of their arrest. The victim's husband testified that he left for work at approximately 6:30 a.m. on the morning of the victim's murder. The defendant told the police that the offense occurred in a house on Pendleton Street in the early morning hours after the sun had "come up." The reports at the time the murder occurred reflected that the murder occurred on Pendleton Street in the morning. Because "[o]nly slight evidence of the *corpus delicti* is necessary to corroborate a confession and thus sustain a conviction," *Ervin*, 731 S.W.2d at 72, we conclude that the State has satisfied this requirement and demonstrated that the defendant was criminally responsible for the death of the victim.

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment from the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE