IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 15, 2012

## STATE OF TENNESSEE v. LAVONTA LAVER CHURCHWELL

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-A-260      Seth Norman, Judge**

_____

**No. M2011-00950-CCA-R3-CD - Filed February 4, 2013**

_____

Defendant, Lavonta Laver Churchwell, was indicted by the Davidson County Grand Jury for two counts of first degree premeditated murder, two counts of first degree felony murder, and two counts of especially aggravated robbery. Defendant was convicted by a petit jury of two counts of felony murder, two counts of especially aggravated robbery, and two counts of criminally negligent homicide. The trial court merged Defendant's convictions for criminally negligent homicide into his felony murder convictions. He was sentenced by the trial court to an effective life sentence with all sentences running concurrently. In this direct appeal, Defendant asserts that: 1) the evidence was insufficient to sustain his convictions; 2) the State failed to establish the corpus delicti because the State offered no corroborating evidence of the testimony of the jailhouse informants; 3) Defendant's admissions to the jailhouse informants were elicited in violation of *Massiah v. U.S.*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964); and 4) the trial court erred by allowing testimony that Defendant threatened a jailhouse informant. The State responds that Defendant has waived all issues save that of sufficiency of the evidence by failing to file a timely motion for new trial. We conclude that Defendant's motion for new trial was timely filed and review the merits of each issue. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, PJ., and NORMA MCGEE OGLE, J., joined.

Paul Julius Walwyn, Madison, Tennessee, for the appellant, Lavonta Laver Churchwell.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General, Rob McGuire, Assistant

District Attorney General; and Sarah Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts*

The victims in this case were 32-year-old Dr. Pierre Robert Colas and his sister, Marie Colas, who was 27 years old. They were originally from Germany. Both victims were found shot to death in Dr. Colas' East Nashville home. Dr. Colas was an assistant professor of anthropology at Vanderbilt University, and Ms. Colas was visiting from Germany. Dr. Colas was a specialist on the ancient writing of the Maya and an accomplished heiroglypher. He was one of only 15 people in the world who was able to read the ancient Maya script, and he spoke Yucatec, a Mayan language. Dr. Sergio Romero, a friend and colleague of Dr. Colas, moved into Dr. Colas' house days before Dr. Colas' death. Dr. Romero testified that Dr. Colas did not have any curtains or blinds on his windows because "he thought that if people could see from the outside into the house, they could see that there was nothing of value in the house." Dr. Colas also preferred to have the windows and doors in the house open during the summer. Dr. Romero testified that a few days prior to the murder, he saw two people looking through the kitchen window. He asked them what they were doing there, and "[t]hey turned around and said, [s]hut up, [b]itch, and just walked off." They walked to a car parked across the street and left. Dr. Romero did not call the police.

On the evening of August 26, 2008, Dr. Romero attended a faculty meeting at Vanderbilt. Dr. Colas did not attend because his sister was visiting from Germany. Dr. Romero returned to the house at approximately 8:00 p.m. Marie Colas met him at the door as he entered. Dr. Romero then began to walk upstairs, and he passed Dr. Colas in his office working on his computer. Dr. Romero was watching a show on his computer when he heard people "talking and walking inside of the house" approximately ten or fifteen minutes after he went upstairs. He then heard Dr. Colas scream and he heard a gunshot. He then checked the door to his room to make sure it was locked and called 911.

Officer Shane Fairbanks, of the Metropolitan Nashville Police Department, responded to the 911 call made by Dr. Romero. Officer Fairbanks testified that when he entered the home, he saw the victims lying on the floor in a pool of blood. Robert Colas was wearing only a pair of shorts, and Marie Colas was wearing only underwear. She was lying across Robert Colas' legs. Officer Fairbanks testified that Ms. Colas "was moaning, making noises, nothing coherent, but making noises, moaning." Dr. Colas was not making any sounds at all, and Officer Fairbanks "wasn't sure if he was still alive or not." Officers searched the rest of the house and found Dr. Romero upstairs. They brought Dr. Romero downstairs, and Dr.

Romero saw Marie Colas covered in blood and wailing. Paramedics arrived and took Marie Colas away in an ambulance. Dr. Colas died at the scene, and Marie Colas died on August 31, 2008.

Officer George Bouton, of the Metro Nashville Police Department, also responded to the scene. He testified that upon entering the residence, he observed a rug on the floor that was "tipped back almost folded over," and Dr. Colas's body was lying to the right of the front door in a foyer area. Officer Bouton saw a "pile of clothing" in the living room. He testified there was blood on the floor and on the walls. Officer Bouton began taking photographs of the crime scene. He testified that he was unable to lift any identifiable latent prints from the crime scene. Officer Bouton found a pair of latex gloves near the victims' bodies, which TBI crime lab testing revealed had George Cody's DNA on them. Cody's DNA was also found on the handgun that was determined to have been the murder weapon.

Dr. Amy McMaster, of the Davidson County Medical Examiner's Office, performed the autopsy on Dr. Colas. She testified that Dr. Colas died from a gunshot wound to the right side of the head. Dr. McMaster recovered the bullet from the left maxillary sinus. She testified that Dr. Colas' injury would have been almost immediately fatal. Dr. McMaster testified that Marie Colas also suffered a gunshot wound to the head with the bullet moving from left to right from the front of the skull to the back and slightly downward. She was able to recover a bullet jacket and a portion of the bullet. Marie Colas lived for six days following the shooting; however, Dr. McMaster testified, she suffered a devastating brain injury that she could not have survived. Dr. McMaster determined that the manner of death for both victims was homicide.

Detective Matthew Filter, of the Metropolitan Nashville Police Department, was assigned to investigate the murders in this case. He responded to the crime scene on August 26, 2008. He testified that a cartridge casing was found near Dr. Colas' body, indicating that the victims were shot with a semi-automatic handgun. Detective Filter determined that the victims' credit cards and IDs had been taken. He discovered that the credit cards had been used at a Walmart in Madison, Tennessee, within three hours of the murders. Detectives obtained a surveillance video from the store that showed George Cody, Thomas Reed, and Michael Holloway making purchases with the credit cards. Officers located Cody a few days later and took him into custody. They obtained a search warrant for his house, located only a few blocks from the crime scene, and recovered the victims' credit cards and IDs and two firearms, including a .22 revolver and a .380 caliber semi-automatic handgun. Ballistics testing concluded that the bullets recovered from the victims' bodies were fired from the semi-automatic handgun. Investigators determined that Reed and Holloway, who were seen with Cody using the victims' credit cards, were not involved in the murders. Both Reed and Holloway had alibis that were verified.

Detective Filter testified that Defendant and Nathaniel Carson were subsequently developed as suspects in the murders. Detective Filter interviewed Defendant on September 8, 2008, at the East Police Precinct with Defendant's attorney present. During the one-hour long interview, Defendant maintained that he was in Antioch on the date of the murders. When Detective Filter confronted Defendant with Defendant's cell phone records, which showed that Defendant was in East Nashville in the area of the victim's residence at the time of the murders, Defendant admitted that he had been in East Nashville but claimed that he was at his grandmother's house. Detective Filter testified that details of the crime scene and the investigation were not released to the media or public during the investigation.

Andrew Jones shared a cell with Defendant at the Criminal Justice Center in Nashville. After being incarcerated together for about a week, Defendant asked Jones whether Defendant's fingerprints would still be present if he had shot someone and then handed the gun to another person. He also asked whether his fingerprints would remain on credit cards for several months and why blood might come from someone's mouth and nose after shooting them in the body. Defendant told Jones about "the white boys" who used the victims' credit cards. Defendant told Jones that George Cody and his girlfriend had accused him of the crimes but that there was no evidence to place Defendant at the crime scene. Defendant told Jones about two potential alibis that he was going to use. Defendant admitted to Jones that he had committed the murders. Defendant and Jones got into an argument, and Jones expressed doubt about Defendant's involvement in the crimes. Defendant replied, "I killed the fucking professor, and I'm glad because he got me put here."

Jermaine Jenkins, a fellow inmate, testified that he was incarcerated with Defendant in 2009. Jenkins testified that he and Defendant were housed in the same pod and were both charged with felony murder. He testified that Defendant told him that he committed the murders in this case. Defendant told Jenkins that he and his brother "Shorty" and George Cody had planned to rob Dr. Colas as part of a "gang initiation." Defendant described the victim's house to Jenkins. He told Jenkins that they took the victim's cash and credit cards and that Cody kept the credit cards and the murder weapon. Defendant expressed concern that his fingerprints might be on the gun. He told Jenkins that he intended to give an alibi "that he was on the phone at the time, then he switched his statement saying that he was riding around at the time." Defendant also told Jenkins that they recruited two white males to use the victim's credit cards "to throw off the case." Jenkins was particularly troubled by Defendant's description of the victims' bodies, testifying, "he kept talking about the brains being blown out." He testified that Defendant had expressed concern that his fingerprints were on the murder weapon.

Jenkins testified that he overheard an argument between Defendant and inmate Andrew Jones. He heard Defendant say, "yeah, I killed the motherfuckers. Yeah, I killed

the white motherfuckers." Jenkins later told Defendant, "[y]ou talk too much, everybody heard you." Jenkins testified that another inmate, Maurice Boyd, became aware of Defendant's involvement in the murders and began questioning Defendant about it. Defendant told Jenkins that "he was going to have Maurice fucked up." Jenkins testified that on the day following Defendant's confrontation with Jones, Defendant was moved to a different floor. Jenkins subsequently learned that Boyd was stabbed while in custody. Jenkins saw Defendant again approximately two months later, and Defendant stated that "he had shot the kite up to his brother[,]" Shorty, which meant that Defendant sent a letter to his brother inside the jail stating that Boyd had "been handled." Maurice Boyd had been interviewed by investigators regarding the Colas' murders prior to being stabbed.

Defendant testified at trial that he was not involved in the murders and denied having told Jones or Jenkins that he was involved.

*Analysis*

Defendant asserts that the evidence at trial was insufficient to support his convictions. Specifically, Defendant argues that the strongest evidence against him was the "flimsy and unreliable testimony of the jailhouse informants," which Defendant asserts were uncorroborated and taken in violation of *Massiah v. U.S.*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). Defendant also asserts on appeal that the trial court erred by allowing testimony that Defendant threatened a potential jailhouse informant.

The State responds that Defendant has waived all issues except sufficiency of the evidence by failing to file a timely motion for new trial. Our rules of appellate procedure provide that a defendant must allege all grounds upon which he seeks a new trial in a motion in order to secure this court's review of those grounds on appeal:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e). Therefore, when a defendant on appeal raises a ground for relief that was not the subject of a properly filed motion for new trial, "the issue will generally be deemed waived and will be considered only within the limited parameters of an appellate court's discretionary plain error review." *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008).

"Unlike the untimely filing of the notice of appeal, this Court does not have the authority to waive the untimely filing of a motion for new trial." *See* Tenn. R. App. P. 4(a); *State v. Patterson*, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997). This court has previously held that pursuant to Rule 3(e) "the failure to file a motion for a new trial, the late filing of a motion for a new trial, and the failure to include an issue in a motion for a new trial results in waiver of all issues which, if found to be meritorious, would result in the granting of a new trial." *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) (footnote omitted). This waiver does not apply however, if the issue is found to be meritorious and would result in the dismissal of the prosecution against the accused. *Id*. at 416 n. 5 (citing *State v. Davis*, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987); *State v. Durham*, 614 S.W.2d 815, 816 n. 1 (Tenn. Crim. App.1981)). In addition, we also may consider errors affecting the substantial rights of the defendant if review is necessary to do substantial justice, i.e. "plain error." Tenn. R. Crim. P. 52(b); *State v. Johnson*, 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998); *State v. Maynard*, 629 S.W.2d 911, 913 (Tenn. Crim. App. 1981).

In the present case, the trial court entered the judgments of conviction on August 19, 2010. On September 9, 2010, Defendant filed a "Motion for New Trial." The motion stated in its entirety:

> Comes now the defendant, Lavonta Churchwell, by and through counsel, and pursuant to the Fourteenth Amendment to the United States Constitution, Article One §§ 8, 9 of the Tennessee Constitution and Tennessee Rule of Criminal Procedure 33, and moves this Honorable Court to grant him a new trial on Indictment 2007-D-3503. Additionally, the defendant by and through his attorney requests for permission to amend this Motion for New Trial for other grounds that have yet to be researched at this time.

The motion contained no grounds for relief. On March 4, 2011, Defendant filed another motion for new trial in which he alleged three specific grounds for relief. The trial court heard arguments from counsel on March 4, 2011, and took Defendant's motion under advisement. The trial court subsequently denied Defendant's motion in a written order filed on April 4, 2011.

In *State v. Lowe-Kelley*, 380 S.W.3d 30 (Tenn. 2012), our supreme court reversed this court's judgment and held that a similar motion filed in that case was a valid and timely filed motion for new trial. That motion also contained no grounds for relief and requested the trial court "to allow liberal time under the Rules of Criminal Procedure for the filing of amendments to this Motion for New Trial." The supreme court concluded that the defendant's "timely motion unequivocally stated the purpose of the motion and the relief

requested." *Id*. at 34. Citing the Advisory Commission's comments to Tennessee Rule of Criminal Procedure 33, the court cautioned that "attorneys are not advised to 'make a regular practice of filing only a skeletal motion with the intention of bringing all of their substantive grounds in an amendment' to the motion for new trial[.]" *Id*. The court further held that a trial court, "in considering a motion to amend a skeletal motion for new trial, . . . may consider whether the defendant had a valid reason for failing to include grounds for relief in the original motion for new trial." *Id*. In *Lowe-Kelley*, the defendant's trial counsel filed concurrently with the motion for new trial a motion to withdraw from representing the defendant due to a conflict of interest. The trial court subsequently appointed new counsel, and new counsel filed a motion to amend the original motion for new trial. Our supreme court concluded, "[f]ollowing the appointment of new counsel, it was well within the trial court's discretion to permit the amendment of the motion for new trial to include Defendant's specific grounds for relief." *Id*. at 35.

In light of our supreme court's opinion in *Lowe-Kelley*, we will treat Defendant's original motion for new trial as timely filed and address the issues raised by Defendant on appeal.

*Sufficiency of the Evidence*

Defendant contends that the evidence at trial was insufficient to support his convictions. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Smith*, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *Liakas*, 286 S.W.2d at 859. This court must afford the State the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of

innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *Id*.

Felony murder is "[a] killing of another committed in the perpetration or attempt to perpetrate any . . . robbery . . . ." Tenn. Code Ann. § 39-13-202(a)(2). The offense of especially aggravated robbery is "robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon . . . [and w]here the victim suffers bodily injury." Tenn. Code Ann. § 39-13-403. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

Viewed in the light most favorable to the State, the evidence showed that the victims both died of gunshot wounds to the head, and the victims' credit cards were taken from them. Two inmates testified that, while incarcerated with Defendant, Defendant confessed that he and two others shot the victims and stole their credit cards. The jury accredited those witnesses. In recounting Defendant's confession, both witnesses were able to provide information that the police had not released to the media or the public. Defendant's cell phone records showed that Defendant was in the area where the murders occurred. George Cody, who Defendant stated was involved in the murders, left DNA at the scene and on the murder weapon. The murder weapon and the victim's credit cards and IDs were recovered from Cody's home. Forensic testing showed that the .380 semi-automatic handgun taken from Cody's home was consistent with the weapon that fired the projectiles recovered from the victims' bodies. Defendant told detectives that he was in Antioch at the time of the murders, but Defendant's cell phone records showed that he was in the area of the murders when the murders occurred. We conclude that the evidence was sufficient to support Defendant's convictions. Defendant is not entitled to relief on this issue.

Defendant also argues that the evidence was insufficient to establish the corpus delicti of the crime because the State presented no corroborating evidence of Defendant's admissions to the jailhouse informants. The corpus delicti of a crime may not be established by a confession alone. *Ashby v. State*, 124 Tenn. 684, 139 S.W. 872 (1911). The corpus delicti of a crime requires that the state prove two elements: (1) that a certain result has been produced, and (2) that the result was created through criminal agency. *State v. Ervin*, 731 S.W.2d 70, 71-72 (Tenn. Crim. App. 1986). The elements of corpus delicti may be established by circumstantial evidence. *Id.* at 72. Furthermore, the question of whether the state has sufficiently proven the corpus delicti is a question for the jury. *Id.* at 71. "Only *slight* evidence of the corpus delicti is necessary to corroborate a confession and thus sustain a conviction." *Id.* at 72 (emphasis added).

There was more than sufficient evidence to establish the corpus delicti in this case. The direct evidence that a crime was actually committed in this case includes the victims'

bodies and their cause and manner of death. Dr. Romero heard gunshots, and the victims were found shot to death. Evidence was also presented that the victims' credit cards were taken and used after their deaths. This is not a case in which the only proof that a crime was committed derived from the defendant's confessions alone. Here, the evidence that a crime occurred sufficiently corroborates Defendant's confessions. Defendant is not entitled to relief on this issue.

Defendant also asserts that any incriminating statements made to his fellow inmates were elicited in violation of *Massiah v. U.S.*, 377 U.S. 201 (1964). The State responds that Defendant has waived this issue by failing to object to the admissibility of this evidence on that ground prior to trial. This court has no obligation to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). Nevertheless, we do not conclude the issue is waived and address its merits.

We recognize "the clear rule of Massiah is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Brewer v. Williams*, 430 U.S. 387, 401, 97 S. Ct. 1232, 1240 (1977). Thus, in order to find a *Massiah* violation, a court must first determine (1) whether adversary proceedings had commenced; (2) whether the informant was a government agent; and (3) whether the agent "interrogated" the appellant within the meaning of *Massiah*. We note that Defendant clearly had been formally charged and adversary proceedings had commenced at the time he made statements to Jones and Jenkins. Defendant was incarcerated following his arrest. However, there is no evidence that detectives enlisted Jones or Jenkins to obtain statements from Defendant or that the informants deliberately elicited incriminating statements from Defendant. Defendant is not entitled to relief on this issue.

Finally, Defendant argues that the trial court erred by allowing testimony of threats made by Defendant against a potential jailhouse informant. The State responds that the evidence was not admitted to prove Defendant's action in conformity with a character trait, but rather "to demonstrate a circumstance from which the jury could infer" Defendant's guilt. The State also argues that Defendant has waived this issue by failing to provide appropriate references to the record. This court may treat as waived any "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record . . . ." Tenn. R. Crim. App. 10(b); *see also* Tenn. R. App. P. 27(a)(7)(A); *see State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997). Although we note that Defendant's brief makes no reference at all to the record in support of his argument on this issue, the record is sufficient to allow for appellate review. We will therefore consider the merits of the issue.

At trial, Jermaine Jenkins testified that Defendant, Maurice Boyd, and he were incarcerated together during the Spring and Summer of 2009. He testified that he and Boyd overheard Defendant's statement that he "killed the motherfuckers." Jenkins testified that Boyd "made several attempts to question" Defendant about his involvement in the murders. Regarding Boyd's interest in Defendant's case, Defendant "indicated [to Jenkins] that he was going to have [Boyd] fucked up." Jenkins testified that Defendant was moved to a different floor "[t]he very next day." He testified that he subsequently learned that Boyd was stabbed while in custody in the Fall of 2009. Jenkins saw Defendant again approximately two months after the stabbing. Defendant told Jenkins that he had "shot the kite up to his brother about [Boyd]." Jenkins understood that to mean that Defendant had sent a letter to his brother "Shorty," who was also incarcerated. Jenkins testified Defendant "said he just sent something about [Boyd], he sent the kite to him that it's been handled." Jenkins testified, "the whole jail was still talking about the stabbing basically, and I guess he wanted it to be noted or the recognition that he had it done." Defendant told Jenkins that someone he identified as "Trap" was also involved in the stabbing.

Defendant argues that the testimony should have been excluded under Rule 404(b) of the Tennessee Rules of Evidence. Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court must upon request hold a hearing outside the jury's presence.
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

If a trial court has substantially complied with the procedural requirements of the rule, this court will review the trial court's ruling for an abuse of discretion. *DuBose*, 953 S.W.2d at 652. In this case, the record does not reflect that the trial court substantially complied with

the procedural requirements of Rule 404(b). Prior to trial, the State filed a "Notice of Intent to Use 404(b) Evidence at Trial," in which the State requested a hearing. Defendant filed a pretrial motion to exclude evidence of prior bad acts, specifically, Jenkins' testimony about Defendant's statements regarding Boyd. Prior to calling Jenkins as a witness, the prosecutor offered to proffer Jenkins' testimony in a 404(b) hearing. Defense counsel objected to the testimony, and the prosecutor stated "I have more argument after the witness testifies if the Court wants to hear from the witness." The trial court responded, "No, I think you have summarized the testimony of the witness to me." The trial court ruled, "I have looked at the Maddox case as well as the unreported case of State [v.] Bailey, . . . , and both of them seem to say the same thing, that this is admissible testimony in this matter, therefore [t]he Court will allow the witness to testify." The trial court did not make any findings on the record as to the existence of a material issue other than conduct in conformity with character; that there was clear and convincing proof of the prior bad act; or that probative value outweighed the prejudicial effect. Therefore, we are unable to afford the trial court's ruling deference.

Defendant contends that the evidence was "extraordinarily prejudicial." The State argues that Jenkins' testimony was "highly probative" of Defendant's guilt, particularly because the State relied upon the testimony of two inmates to connect Defendant to the murders. The State posits that the lack of physical evidence "elevates the probative nature of this evidence – if there were abundant physical evidence, testimony about the defendant's attempts to silence a witness would not have the same high level of importance."

"Generally, evidence of threats against witnesses attributed to the accused is probative as being either (1) conduct inconsistent with the accused's claim of innocence or (2) conduct consistent with the theory that the making of such threats evinces a consciousness of guilt." *State v. Austin*, 87 S.W.3d 447, 477 (Tenn. 2002) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 4.01 (4th ed. 2000); *see also State v. Damien Neely*, W2010-01128-CCA-R3-CD, 2011 WL 3768918, at *14 (Tenn. Crim. App., Aug. 24, 2011).

Defendant has failed to persuade this court that the risk of unfair prejudice outweighed the probative value of the evidence. We agree with the State's assertion that the evidence was particularly probative in this case. Defendant threatened to have Boyd "fucked up" after Boyd sought information about Defendant's involvement in the murders. After Boyd was subsequently stabbed, Defendant claimed to have ordered the stabbing. In light of the State's case against Defendant consisting primarily of inmate testimony, evidence that Defendant attempted to silence another inmate was probative of Defendant's guilt. We conclude that the trial court did not err by allowing the testimony. Defendant is not entitled to relief on this issue.

-11-

**CONCLUSION**

After a thorough review of the record, we affirm the judgments of the trial.

_____
THOMAS T. WOODALL, JUDGE